UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

VALERIE HAMMOND,

    Plaintiff,

v.                                                        Case No. 2:08-cv-64
                                                      HON. R. ALLAN EDGAR

GERALD HOFBAUER, Individually and
as Warden of the Marquette Branch Prison,

    Defendant.
_____/

**MEMORANDUM**

Plaintiff Valerie Hammond brings this civil rights action against defendant Gerald Hofbauer, individually and as Warden of the Marquette Branch Prison. The action challenges the constitutionality of Defendant's actions in preventing an assault on Plaintiff at the Marquette Branch Prison where Plaintiff was employed as a nurse. Plaintiff brings claims for violation of her Fifth and Fourteenth Amendment rights to the U.S. Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983").

Defendant moves for summary judgment dismissal of Plaintiff's claims. [Court Doc. No. 51]. Plaintiff opposes the motion. [Court Doc. No. 79]. The court has reviewed the arguments of the parties, the record, and the pertinent law. It has determined that Defendant's motion will be **GRANTED**.

    **I.**     **Background**

The parties agree on the relevant facts pertaining to the assault on Plaintiff by an inmate at the Marquette Branch Prison. They disagree, however, on the relevant facts pertaining to steps

that could have been taken to prevent the attack or to mitigate the harm to Plaintiff. This court will review the facts in the light most favorable to the Plaintiff on summary judgment.

Plaintiff was employed as a registered nurse by the Michigan Department of Corrections ("MDOC"), and she worked at the Marquette Branch Prison in Marquette, Michigan. [Court Doc. No. 1-2, Complaint, ¶¶ 6, 7]. Defendant Hofbauer is the Warden of the Marquette Branch Prison. Plaintiff's Complaint alleges the following facts regarding the assault on her by an inmate seeking medical treatment:

> On or about February 3, 2007, Plaintiff was performing her duties as a registered nurse at the Marquette Branch Prison.
> On that date, an inmate, Albert Eliel, sought medical treatment.
> Accordingly and pursuant to the customs and policies adopted and observed at the Marquette Branch Prison, inmate, Eliel, obtained a pass and transported himself to the medical clinic.
> Pursuant to the customs and policies adopted and observed by the Marquette Branch Prison, Plaintiff was assigned to examine inmate, Eliel, by herself and without any security officers or prison staff present in the clinic and without any security camera's [sic] present.
> During the course of Plaintiff's examination of inmate, Eliel, Plaintiff was physically attacked by inmate, Eliel, and threatened with rape and murder.
> During the course of said assault, inmate, Eliel, removed a razor blade from his mouth which he then used in an attempt to further his efforts to rape and/or murder Plaintiff.
> Inmate, Eliel, was allowed by Defendant to transport the razor blade into the medical examination.

Complaint, ¶¶ 9-15.

When Plaintiff received Eliel in the examination room there were no other witnesses present. During the medical examination of Prisoner Eliel, Plaintiff requested that he provide her with a urine sample. *See* [Court Doc. No. 79-3, Deposition of Valerie Hammond ("Hammond Dep."), p. 74]. When she turned around to obtain the urine cup, Eliel closed the door to the examination room and began to approach her. *Id.* Plaintiff removed the telephone from its hook

once Eliel did not appear to be responding to her suggestion that he go to the bathroom to obtain the urine sample. She understood that by taking the phone off of its base she would signal an alarm that would send a prison guard to check on her. *Id.* at p. 75. At that point Eliel lunged forward and told Plaintiff that he was going to rape her. *Id.* at p. 76. Plaintiff struggled with Eliel for approximately ten to twelve minutes before a prison guard entered the room and aided her. During the assault Eliel removed a sharp metal object from his mouth and threatened to kill Plaintiff with it. After the assault ended investigators recovered a razor blade from the floor near where the altercation occurred. *Id.* at pp. 77-81.

Plaintiff testified that prior to the assault she requested that prisoners receive escorts when they were received in the healthcare facility. Hammond Dep., p. 98. She further asserts that she asked Defendant directly to provide greater supervision to prisoners when they were receiving medical attention from nurses. *Id.* at p. 105. She testified:

> And when Warden Hofbauer came through to begin with, I told him that – and asked him that I didn't think that it was safe that nurses should be in a locked room with prisoners. And he at the time – we couldn't even get out of the room without keying the room. And that's the way it is to this day, as far as I know. And I asked that that be changed, that we should not have to key a doorknob to get out of a room that you're in with a prisoner. And we're talking level 5 prisoners when we were in the clinic. And he said that he would get that changed.

*Id.*

Plaintiff claims that Defendant's failure to take several preventative measures facilitated the violent attack upon her by Eliel. Plaintiff contends that the following specific steps taken or not taken by Defendant increased the risks to her safety:

    a.    Permitting a violent offender to have possession and control of a razor blade;
    b.    Requiring nurses such as Plaintiff to examine prisoners who have a history

of violent, sexual assault by themselves;
c.     Refusing to permit prison guards or other staff to be present in the clinic when nurses such as Plaintiff examined prisoners who had a history of violent, sexual assaults;
d.     Failing to install security cameras in the examination rooms;
e.     Failing to institute a policy which required that inmates be searched before entering the examination room;
f.     Failing to heed the fears, suggestions and advice of the nursing staff that they should not be required to examine prisoners alone; . . .
h.     Failing to have the appropriate and necessary staffing in the clinic; . . . .

Complaint, ¶ 32. She provides the court with a job description for the Warden, which includes "organizing and enforcing procedure for security." [Court Doc. No. 79-7]. Her Complaint further contends that "[t]he inmate who assaulted, battered and threatened Plaintiff had a history spanning more than twenty years of engaging in criminal sexual assaults" and that "[p]rior to February 3, 2007. [sic] Defendant, Hofbauer, knew or should of [sic] known of inmate, Eliel's, propensity to engage in criminal sexual assaults." Complaint, ¶¶ 17-18.

**II.     Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R.

Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

### III. Analysis

#### A. Eleventh Amendment Immunity

Defendant first claims that he is immune from suit in his official capacity under the Eleventh Amendment to the U.S. Constitution. Plaintiff asserts in her response to the motion for summary judgment that she is not suing Defendant in his official capacity. The court concludes that Plaintiff's Complaint is vague regarding this issue as her caption reads that the Defendant is "Gerald Hofbauer, Individually and as Warden of the Marquette Branch Prison." Therefore, the court will address the Eleventh Amendment immunity question.

The Eleventh Amendment to the U.S. Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. In interpreting the terms of the Eleventh Amendment, the U.S. Supreme Court has made clear that:

> [a]lthough by its terms the Amendment applies only to suit against a State by

> citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States. The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.

*Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 364, 121 S.Ct. 955 (2001) (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 72-73, 120 S.Ct. 631 (2000); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114 (1996)) (other citations omitted).

Federal courts have outlined three exceptions to a State's sovereign immunity pursuant to the Eleventh Amendment. *See Key v. Grayson*, 163 F.Supp.2d 697, 709 (E.D. Mich. 2001). First, it is possible for a state to waive its immunity and consent to suit in federal court. *See id.* (citing *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423 (1985)); *see also, Abick v. State of Michigan*, 803 F.2d 874, 876 (6th Cir. 1986); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 97-99, 104 S.Ct. 900 (1984), *overruled in part on other grounds by Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312 (1989). However, Michigan as a state has not waived its immunity under the Eleventh Amendment. *See Abick*, 803 F.2d at 877. Further, as an agency of Michigan, MDOC is also protected from suit under the Eleventh Amendment. *See Sims v. Michigan Dep't of Corrections*, 23 F.App'x 214, 215, 2001 WL 1298990 (6th Cir. 2001); *Lee v. Michigan Parole Board*, 104 F.App'x 490, 492, 2004 WL 1532563 (6th Cir. 2004); *Fleming v. Martin*, 24 F. App'x 258, 259, 2001 WL 1176354 (6th Cir. 2001) (relying on MICH. CONST., art. V, § 2 (1963)). In addition, "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.' Thus, '[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign

if the decree would operate against the latter.' *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101 (quotations omitted).

Second, an individual may bring a suit against a state official that seeks injunctive relief to stop future continuing violations of federal law. *See Key*, 163 F.Supp.2d at 709; *Ex Parte Young*, 209 U.S. 123, 167, 28 S.Ct. 441 (1908); *Green*, 474 U.S. at 68, 106 S.Ct. 423. However, in this action Plaintiff is not seeking prospective injunctive relief. *See* Complaint.

Third, Congress may validly abrogate the States' immunity under the Eleventh Amendment. *Key*, 163 F.Supp.2d at 709 (citing *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114). There is no suggestion here that Congress has abrogated Michigan's immunity in this Section 1983 action for alleged violations of Plaintiff's 5th and 14th Amendment rights.

The Eleventh Amendment thus provides immunity to the State of Michigan and its agency, MDOC, from Plaintiff's Section 1983 claims. Plaintiff's claims against the Defendant in his official capacity will therefore be **DISMISSED** in their entirety with prejudice.

### B. Claims Against Defendant in His Individual Capacity

Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. To establish a claim pursuant to Section 1983, plaintiffs must demonstrate two elements: "(1) the defendants deprived [plaintiffs] of a right, privilege, or immunity secured to [them] by the United States Constitution or other federal law; and (2) the defendants caused

the deprivation while acting under color of state law." *Cunningham v. Sisk*, No. 1:01CV182, 2003 WL 23471541, *5 (E.D. Tenn. 2003) (citing *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000), *abrogated in part on other grounds as stated in DiLaura v. Township of Ann Arbor*, 471 F.3d 666, 671 n.2 (6th Cir. 2006))). Only the first prong of the test is relevant in this action because the Defendant does not dispute that he was acting under color of state law.

Section 1983 "'creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere.' " *Alexander v. Haymon*, 254 F.Supp.2d 820, 830 (S.D. Ohio 2003) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000)). Plaintiff alleges that the Defendant violated her Fifth and Fourteenth Amendment rights under the U.S. Constitution. U.S. Const. amend. V; U.S. Const. amend. XIV.

Defendant claims that his actions are protected by the doctrine of qualified immunity. The doctrine of qualified immunity "shields 'government officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The U.S. Supreme Court has established a two-part test, the order of which the Court has relaxed, for determining whether a law enforcement officer is entitled to qualified immunity. *See Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005) (citing *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)). Under this test district courts must:

> consider whether 'the facts alleged show the officer's conduct violated a constitutional right.' . . . If the plaintiff can establish that a constitutional violation occurred, a court should ask 'whether the right was clearly established . . . in light

of the specific context of the case, not as a broad general proposition.'

*Lyons*, 417 F.3d at 571 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The Supreme Court has recently receded from the strict formula described in *Saucier v. Katz* and determined that the *Saucier* "procedure should not be regarded as an inflexible requirement." *See Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 812 (2009). The Court explained that:

> [o]n reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Pearson*, 129 S.Ct. at 818.

A right may be defined as clearly established by looking to Supreme Court precedent, then to Sixth Circuit precedent, then to other courts within the Sixth Circuit, and finally to decisions of other circuits. *See Gardenhire*, 205 F.3d at 311. In addition, "[q]ualified immunity affords government officials an immunity from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Burden v. Carroll*, No. 03-2149, 108 F. App'x. 291, 293, 2004 WL 1826602 (6th Cir. Aug. 12, 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). This analysis should consider the legal rules that are clearly established at the time the defendants took the alleged actions. *See Rodgers v. Jabe*, 43 F.3d 1082, 1085 (6th Cir. 1995) (relying on *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)).

Once a defendant claims the affirmative defense of qualified immunity, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense of qualified immunity. *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (citing *Gardenhire*, 205 F.3d at 311). Law enforcement officials will be entitled to qualified immunity " 'when their decision was *reasonable,* even if mistaken.' " *Pray*, 49 F.3d at 1158 (quoting *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)). Further, " '[if] officers of reasonable competence could disagree on this issue, immunity should be recognized.' " *Pray*, 49 F.3d at 1158 (quoting *Malley v. Briggs*, 475 U.S. 335, 349, 106 S.Ct. 1092, 1100, 89 L.Ed.2d 271 (1986)).

The first question this court will ask is whether Defendant Hofbauer violated Plaintiff's constitutional rights. In contrast to many Section 1983 cases, Plaintiff was not a prisoner or a detained individual, she was employed by MDOC. Therefore, the court must look for analogous cases to determine whether Plaintiff has demonstrated the violation of a constitutional right. Plaintiff, in her opposition brief, asserts that she is pursuing a state created danger theory of liability. *See* [Court Doc. No. 79, p. 17]. She alleges violations of her Fourteenth and Fifth Amendment rights.

The Fourteenth Amendment states in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *see also DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 194-95, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Fifth Amendment to the U.S. Constitution also contains a Due Process Clause that is a counterpart to the Due Process Clause of the Fourteenth Amendment. *DeShaney*, 489 U.S. at 197; *Schroder v. City of Fort Thomas*, 412 F.3d 724, 727 (6th Cir. 2005). However, as the Supreme Court has noted, "nothing in the language of the Due Process Clause itself requires the

State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195. Thus, "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

The Sixth Circuit recognizes two exceptions to the general rule expressed by the Supreme Court in *DeShaney*:

> Under the first exception, 'when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.' . . . Under the second exception, where a State creates a more perilous situation that renders citizens more vulnerable to danger at the hands of private actors, a plaintiff may bring a substantive due process claim by establishing (1) an affirmative act by the State that either created or increased the risk that the plaintiff would be exposed to private acts of violence; (2) a special danger to the plaintiff created by state action, as distinguished from a risk that affects the public at large; and (3) 'the requisite [state] culpability to establish a substantive due process violation.'

*Schroder*, 412 F.3d at 727-28 (quotations and citations omitted).

The first exception, known as the "custodial" exception, applies in situations in which the State has custody over an individual, such as a prisoner or an involuntarily committed patient. *See Schroder*, 412 F.3d at 728. Plaintiff does not claim to fit into this exception. Instead, Plaintiff argues that her situation fits the second exception, the state created danger exception.

Federal courts have issued decisions in several cases that bear close resemblance to the situation at hand. The court will start with a review of the United States Supreme Court decision in *Collins v. City of Harker Heights, Texas*. 503 U.S. 115, 112 S.Ct. 1061 (1992). In that

decision the Supreme Court plainly held:

> The question presented is whether § 1 of the Civil Rights Act of 1871, Rev. Stat. § 1979, 42 U.S.C. § 1983, provides a remedy for a municipal employee who is fatally injured in the course of his employment because the city customarily failed to train or warn its employees about known hazards in the workplace. Even though the city's conduct may be actionable under state law, we hold that § 1983 does not apply because such conduct does not violate the Due Process Clause.

*Id.* at 117, 112 S.Ct. at 1064. In *Collins* the petitioner, a widow of a municipal sanitation worker, brought suit against the city after her husband died of asphyxia upon entering a manhole to unstop a sewer line. His widow sued the city claiming that her deceased husband had a constitutional right to be free from unreasonable risk of harm. *Id.* She alleged that a prior safety incident provided the city with notice of the safety issues existing in maintaining the sewer lines.

> The Supreme Court rejected the widow's constitutional claim, noting:
>
> Neither the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause. . . . Our refusal to characterize the city's alleged omission in this case as arbitrary in a constitutional sense rests on the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces. Decisions concerning the allocation of resources to individual programs, such as sewer maintenance, and to particular aspects of those programs, such as the training and compensation of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country. The Due Process Clause "is not a guarantee against incorrect or ill-advised personnel decisions." Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of harm.

*Id.* at 126-129, 112 S.Ct. 1061.

Since the *Collins* case the Sixth Circuit has issued opinions dealing with similar constitutional claims of government employees. Although not cited by either party, the case of

*Sperle v. Michigan Dep't of Corrections* is strikingly similar to the case at hand. 297 F.3d 483 (6th Cir. 2002). In that case the decedent's husband brought a suit pursuant to Section 1983 on his wife's behalf following her murder by an inmate at a Michigan state prison. *Id.* at 486. The wife had been a storekeeper employed at the prison. The plaintiff sued MDOC, as well as several individuals associated with MDOC. The plaintiff alleged, among other claims, that the defendants violated the wife's substantive due process rights by failing to prevent the murder. *Id.* He asserted that the individual defendants in the case "exhibited deliberate indifference to the life and liberty of his wife." *Id.* at 490. He further contended that the defendants created the risk of the inmate killing her and made her more vulnerable to his attack. He argued that the inmate's prior criminal record revealed his violent tendencies, that the inmate was not properly supervised on the day of the attack, and that employees' personal protection devices did not work in the area where the attack occurred.

In discussing Plaintiff's due process claim, the Sixth Circuit determined that Plaintiff's Section 1983 claim needed to be examined under a "deliberate indifference" standard. *Sperle*, 297 F.3d at 492. As the Sixth Circuit noted in *Watkins v. City of Battle Creek*:

> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm . . . This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. '[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'

273 F.3d 682, 686 (6th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) (citations omitted).

In *Sperle* the Sixth Circuit concluded that the deliberate indifference standard was

appropriate because the plaintiff "worked in a 'custodial setting,' an environment where the defendants had the opportunity to design the security precautions at the HVMF and to respond to any general dangers that existed." *Id.* The court held that plaintiff had not demonstrated a violation of his wife's 14th Amendment due process rights:

> We will therefore assume, without deciding, that the defendant's actions and omissions increased the danger of Tammy Sperle being harmed by an inmate at the prison. Nevertheless, we conclude that the defendants did not act with the degree of culpability necessary to hold them liable for a substantive due process violation. Even if the individual defendants could have made the working conditions safer for Tammy Sperle by providing PPDs to school building employees, adding extra security guards, or insuring greater supervision of [the attacker], they did not act in an arbitrary manner that "shocks the conscience" or that indicates any intent to injure her.

*Id.* at 493.

In *Sperle* the Sixth Circuit relied on another Sixth Circuit decision, *Nobles v. Brown*. 985 F.2d 235 (6th Cir. 1992). In *Nobles* the plaintiff prison guard sued several MDOC prison officials after an inmate captured her and raped her. *Id.* at 235. She brought claims pursuant to Section 1983 for alleged violations of the Fourteenth Amendment. In denying plaintiff's claims, the Sixth Circuit noted, "the Fourteenth Amendment was not adopted to constitutionalize the law of negligence for state employees." *Id.* at 236. The court found that "[h]owever derelict in their duties the defendant prison officials may have been here, it cannot be said that they *deliberately* decided to have plaintiff Nobles taken captive and raped . . ." *Id.* The court concluded that:

> In the instant case, again, it was not the defendants who took Mrs. Nobles captive and assaulted her; it was prisoner Paul Newson. Mr. Newson was not acting under color of any state "statute, ordinance, regulation, custom, or usage," and the outrage suffered by Mrs. Nobles is simply not compensable in a federal civil rights action.

*Id.* at 238 (quoting 42 U.S.C. § 1983). Again, in *Hayes v. Vessey* the Sixth Circuit found no due

-14-

process violation by individual prison officials where they failed to prevent a rape of a prison employee by an inmate. 777 F.2d 1149 (6th Cir. 1985).

Other federal courts have also found no due process violations by prison officials when prison employees have been attacked by inmates. In *Jesus Benavides v. Santos*, the Fifth Circuit addressed whether:

> those who, in the course of their duties as local jail detention officers, are injured by jail inmates attempting to escape, have a section 1983 claim against the government officials in charge of the jail where the injury would not have occurred but for those officials' callous indifference or grossly negligent failure to prevent, or to adequately guard against, or to protect those injured from, the attempted escape and accompanying inmate violence.

883 F.2d 385, 387 (5th Cir. 1989). The court concluded no such claim existed:

> Section 1983 does not federalize tort law. While reckless or grossly negligent conduct by government officials in charge of prisons may cause injury to prison guards by third persons, a claim against the officials on that basis falls "squarely within traditional state tort law." Although these cases seem to present an anomaly in that they appear to afford greater protection to prisoners than to prison guards, the affirmative duty to protect a prisoner (as well as a mental patient or other incarcerated person) arises only because of and "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." By contrast, prison guards are employees who "enlisted, on terms they found satisfactory, and [who] were free to quit whenever they pleased."

*Id.* at 388 (quoting *Washington v. District of Columbia*, 802 F.2d 1478, 1480, 1482 (D.C. Cir. 1986) and *DeShaney*, 489 U.S. 189, 109 S.Ct. at 1005) (other citations omitted).

In denying the Section 1983 due process claims of the estates of three prison guards killed and other prison guards injured by prisoners in a prison riot, the Seventh Circuit held in *Walker v. Rowe* that "the due process clause does not assure safe working conditions for public employees." 791 F.2d 507, 510-11 (7th Cir. 1986). The court expanded on its reasoning:

> Governments regularly sacrifice safety for other things. A city may decide to spend more money on parks or education and less on police, even though its officials know that the expenditure on police would reduce the cost of crime by more than the expenditure on the police. It may do this without answering in damages to people subsequently mugged in the parks. . . . People through the democratic process may choose more or less "crime in the streets" by altering their support of the police, the courts, social welfare programs, and economic policies stimulating growth; so too they may alter their support of safety programs for prison guards. And they may choose how to deal with the risks that inhere in prisons – they may choose to provide greater safety through designing new prisons and doubling the number of guards, or they may choose to afford remedies such as workers' compensation, insurance, and special payments to injured guards. . . . Would-be guards must decide whether to take the job – with a given mix of salary, safety, and compensation for injury –or to seek work elsewhere. . . . The constitution no more assures a safe job than it does a job with a generous salary.

*Id.* at 510. *See also, Hartman v. Bachert*, 880 F.Supp. 342 (E.D. Pa. 1995) (finding no liability of government defendants under Section 1983 for due process violations where officer was killed in line of duty while serving arrest warrant).

In *Hartman* the district court addressed the "state created danger" exception to the *DeShaney* decision. *See* 880 F.Supp. at 355. In determining that plaintiff's claims did not fit into the "state created danger" exception, the court explained,

> [i]n each of the cases cited as support by plaintiff, officials failed to take action to alleviate a danger which they created or aggravated. In the present action, . . . however, we can find nothing in the record before us that suggests that defendants encouraged, facilitated or authorized Parker's unwarranted and fatal assault on Deputy Sheriff Hartman. The service of warrants was a routine and daily practice for Deputy Hartman. Defendants did not send decedent to serve warrants, and it was a duty he performed voluntarily as part of his employment.

*Id.* at 356. *See also, Rutherford v. City of Newport News*, 919 F.Supp. 885 (E.D. Va. 1996) (no due process violation against city and officials when police officer was fatally shot by armed robbers while posing as a pizza delivery driver).

In this action Plaintiff does not contend that Defendant deliberately sent prisoner Eliel to

-16-

the Plaintiff's medical examination room with the intent to have Eliel assault her. Eliel himself requested medical attention for abdominal pain. Plaintiff requested that he come to the health center area so that she could examine him, a task she apparently performed routinely and voluntarily on prisoners. Although it is true that Defendant could have made different decisions regarding the safety of the prison's nursing staff, such as having prisoners escorted by guards to the medical treatment facility, it does not appear that Defendant's inaction rises to the level of deliberate indifference that shocks the conscience. Like the plaintiffs in *Noble* and *Sperle* Plaintiff here cannot demonstrate a violation by Defendant of constitutional magnitude. 297 F.3d 483; 985 F.2d 235. As explained by the court in *Hartman,* unlike "state created danger" cases, Plaintiff has not demonstrated that Defendant encouraged, facilitated, or authorized Eliel's attack on Plaintiff. 880 F.Supp. at 356.

Even if Plaintiff could demonstrate the first two prongs of the "state-created danger" exception, she fails to demonstrate the third prong of the exception. The culpabilty prong requires government action so "egregious" that it is "arbitrary in the constitutional sense" and "shocks the conscience." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). When actual deliberation is practical, the standard to be applied is "deliberate indifference," which is similar to "subjective recklessness." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003); *Ewolski*, 287 F.3d at 510. Although Defendant may have been negligent in procuring the safety of the prison nursing staff, there is nothing in the record that suggests that he was deliberately indifferent to the safety of the nurses or that he in any way intended or was indifferent to prior knowledge of Eliel's specific intention to attack Plaintiff.

In one analogous case in which a due process claim was found, the facts are distinguishable from Plaintiff's situation. *See L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992). There, the Ninth Circuit found that a nurse at an institution for young male offenders had stated a claim under Section 1983 for a due process violation. An inmate, known for his propensity for violence against women, was promoted to a job putting him in close contact with plaintiff. *Id.* at 120. Once in the position, the inmate assaulted, kidnapped, and raped the plaintiff. *Id.* The plaintiff alleged that the individual defendants misrepresented the risks associated with her job. *Id.* at 121. She also asserted that the defendants promoted the violent offender to a position where he would be alone with her for long periods of time. She further alleged that his files indicated that he was very likely to commit a violent crime against a woman if left alone with her. The defendants further knew that the violent inmate would accompany the plaintiff alone as she made her rounds. *Id.* at 120-22. The Ninth Circuit reversed the district court's decision to dismiss plaintiff's complaint, finding that "[d]efendants affirmatively created the dangerous situation which resulted in [plaintiff's] assault." *Id.* at 122.

Unlike *Grubbs*, the Plaintiff in this case has not alleged that Defendant took specific steps that would leave Plaintiff alone with Eliel. Plaintiff made the decision to request Eliel to come to the medical examination room, and Plaintiff made the choice not to have a personal protection device with her. Defendant did not thrust Eliel upon Plaintiff or turn a blind eye towards a specific threat to Plaintiff by Eliel. Plaintiff simply cannot show that Defendant acted with deliberate indifference to her safety such as would establish a constitutional violation. For this reason, Plaintiff's Section 1983 claim must be **DISMISSED** on the merits.

Even if Plaintiff could demonstrate a constitutional violation, the court concludes that she

cannot demonstrate the second prong of the qualified immunity test – i.e. that the constitutional violation was clearly established at the time the incident occurred. A right may be defined as clearly established by looking to Supreme Court precedent, then to Sixth Circuit precedent, then to other courts within the Sixth Circuit, and finally to decisions of other circuits. *See Gardenhire*, 205 F.3d at 311.

This court concludes that due to the presence of analogous decisions such as *Collins*, *Sperle*, and *Noble* denying liability for similar due process claims, it is not clearly established that Plaintiff has alleged a constitutional violation. *See* 503 U.S. 115; 297 F.3d 483; 985 F.2d 235. For this additional reason, Plaintiff's claims against Defendant pursuant to Section 1983 must be **DISMISSED** because Defendant has qualified immunity.

**IV. Conclusion**

For the reasons outlined *supra*, Plaintiff's Section 1983 claims against Defendant will be **DISMISSED** in their entirety with prejudice.

A separate judgment will enter.

                                 */s/ R. Allan Edgar*
                                 R. ALLAN EDGAR
                        UNITED STATES DISTRICT JUDGE